## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JENNIFER EISENBERG and TAU BRAUN,<br><br>               Plaintiffs,<br><br>v.<br><br>NATIONAL DANCE INSTITUTE, RACHEL LEE, KAY GAYNER, ELLEN WEINSTEIN, MARC SOLOMAN, JUAN JOSE ESCALANTE, JOHN P. KEIL, COLLAZO & KEIL LLP,  and JOHN DOES 1-25, said names being fictitious, who are board members of the above named defendants,<br><br>               Defendants. | **CIVIL ACTION**<br><br>**Civ. No.**<br><br><br>**VERIFIED COMPLAINT AND JURY DEMAND** |

The plaintiffs, Jennifer Eisenberg ("Ms. Eisenberg") and Tau Braun ("Dr. Braun") with an address of 1000 Central Avenue, Westfield, New Jersey 07091, by and through their attorneys, Murray-Nolan Berutti LLC, with knowledge as to their own acts, and upon information and belief as to all others, complains of defendants as follows:

### STATEMENT OF THE CASE

1.    Plaintiff Jennifer Eisenberg was terminated by her employer, National Dance Institute ("NDI"), a non-profit educational institution which receives federal funding. In 2020, NDI undertook a program which segregated employees by race and lectured both groups on race-based shibboleths which essentially provided that white people are inherently racist from birth, and challenged the white employees to "unlearn" their supposed inherent racism. Ms. Eisenberg objected to NDI's racial segregation of staff, and then refused to sign a petition circulated by the "people of color" group which reiterated some of the racial stereotypes with which NDI was seeking to indoctrinate its employees, and which suggested the institutionalization of such things within NDI. NDI sought to have separate signatures appended to such petition by the "white

colleagues", which Ms. Eisenberg refused to sign, leading to her being intimidated by another employee thereafter. Ms. Eisenberg wrote to her direct supervisor and the director of Finance and Human Resources of NDI that NDI's conduct was illegal pursuant to federal law. The atmosphere at NDI became hostile as a result of such racial segregation and programming, and violated New Jersey, New York, and federal law.

2.      Ms. Eisenberg went on maternity leave during 2021 after having medical difficulty with conception. During such time, NDI imposed a vaccine mandate on employees returning to work, effective October 1, 2021, with limited exemptions for medical and religious reasons. Ms. Eisenberg, who was supposed to return to work on January 1, 2022, provided NDI with a doctor's note approving of an exemption while Ms. Eisenberg was breastfeeding. The medical exemption was granted, but was essentially irrelevant since at such time, Ms. Eisenberg was on maternity leave. However, when Ms. Eisenberg was scheduled to return, she was advised by defendants, who all were involved at some level with the racial segregation training, or some of them, that the only accommodation that could be made was for Ms. Eisenberg to stay on leave without pay or benefits. Such "accommodation" was only offered for three months, even though defendants knew that Ms. Eisenberg intended to breastfeed for a longer period of time.

3.      The racial animus of defendants toward Ms. Eisenberg was, in whole or in part, the reason for such action, such that Ms. Eisenberg suffered race-based discrimination by defendant NDI and its management, despite NDI being the recipient of pertinent federal programming funds, including funds for which Ms. Eisenberg was supposed to be a beneficiary, in violation of 42 U.S.C. § 2000d ("Title VI"), and other law.

4.      Compounding matters is that during a telephone call when Ms. Eisenberg was being told of the disingenuous accommodation, her husband, plaintiff Tau Braun, became involved in

the discussion after he heard some of the defendants behaving illegally on the call. Mr. Braun is expert in human resources subject matter, so he advised defendants during the phone call that they were behaving illegally, after which he got off the call. Based on Dr. Braun's alleged misconduct on the telephone, defendants falsely claimed that Ms. Eisenberg had harassed her superiors. Based on such communication by Dr. Braun, defendants terminated Ms. Eisenberg because of her purported harassment of another member of NDI. Although Ms. Eisenberg was employed with NDI at will, the basis for her termination was a sham to excuse NDI's unlawful racial segregation and discrimination.

5.      Subsequent to termination, defendants defamed both Ms. Eisenberg and Dr. Braun, and Ms. Eisenberg's privacy was violated by communications made by management to staff about her, including assertions directly related to her profession, by asserting Ms. Eisenberg to have acted unprofessionally, which was libelous *per se*.

6.      With the termination ending a 13-year career, Ms. Eisenberg now faces great difficulty with finding comparable employment. First, Ms. Eisenberg now cannot use NDI as a reference for future jobs despite being with NDI for such a long period of time. Additionally, NDI is an internationally recognized arts education organization, with affiliate programs in over 12 states and in China, Lebanon, and Mexico. Ms. Eisenberg worked with and provided trainings for several of NDI affiliates and presented at national dance and arts conferences. Whereas Ms. Eisenberg was experiencing growth in her career at NDI, she now must essentially restart her career. Since Ms. Eisenberg's degree is specialized in dance education, she faces a very limited pool of employers to which she can apply The damage done to Ms. Eisenberg's career is extensive, and the experience of suffering its racial and then medical discrimination has been highly traumatic.

7.     Ms. Eisenberg now sues for intentional discrimination against defendants both for damages and for injunctive relief. Ms. Eisenberg, a New Jersey resident, was considered by defendants, per the NDI handbook, to be at a New Jersey workplace during the time that the race-based training occurred.  NDI created a hostile work environment which led to her termination. Thus, she brings claims under the Title VI \ the New Jersey Law Against Discrimination, the New Jersey Whistleblower statute, and makes several other claims against NDI and others affiliated therewith, as does Dr. Braun.

8.     Ms. Eisenberg also seeks damages against NDI's attorney, John Keil, Esq., and its law firm, Collazo & Keil LLP (together the "Keil Defendants"), which interjected itself into the human resources process and aided in NDI's discrimination of Ms. Eisenberg. The Keil Defendants so acted while purportedly acting as legal counsel for NDI. However, the Keil Defendants are not licensed to practice law in New Jersey, where NDI admits Ms. Eisenberg was employed, such that they were practicing law without a license in New Jersey, thus subjecting them to jurisdiction in New Jersey.

## JURISDICTION AND VENUE

9.     The plaintiffs' claims are brought pursuant to 42 U.S.C. § 2000d, and 21 U.S.C. §360bbb, such that jurisdiction is appropriate, pursuant to 28 U.S.C. §§ 1331 and 1343.

10.     Supplemental jurisdiction is appropriate for claims not arising under the Constitution and laws of the United States, pursuant to 28 U.S.C. § 1367, because they are related to the federal claims within the meaning of that statute.

11.     All plaintiffs reside in the District of New Jersey, and a substantial part of the events or omissions giving rise to the claims occurred in the District of New Jersey, such that venue is appropriate, pursuant to 28 U.S.C. § 1391(b)(1) and (2).

## PARTIES

12.     The Plaintiffs are residents of Westfield, New Jersey.

13.     The defendant National Dance Institute (NDI) is located at 217 West 147th Street, New York, New York 10039, and is a non-profit arts education organization which receives federal funds.

14.     Defendant Rachel Lee is an individual and is the Manager of Finance & Human Resources of NDI who, upon information and belief, resides in New York, New York.

15.     Ellen Weinstein is an individual and was Artistic Director at NDI during some of the relevant time periods herein, such that she was Ms. Eisenberg's direct supervisor at all such times, after which she was promoted to the position of Interim Executive Director who, upon information and belief, resides in New York, New York.

16.     Kay Gayner is an individual and was Artistic Director at NDI during some of the relevant time periods herein, such that she was Ms. Eisenberg's direct supervisor at all such times. She maintains an address of 2601 Frederick Douglass Blvd. Apt. P2. New York, NY 10030.

17.     Defendant Marc Soloman is an individual and was Board Chair of NDI during some or all of the relevant time periods herein who, upon information and belief, resides in New York, New York.

18.     Juan Jose Escalante is an individual and is Executive Director of NDI who, upon information and belief, resides in New York, New York.

19.     John P. Keil is an individual and a member of the law firm Collazo & Keil LLP and, upon information and belief, lives in New York, New York.

20.     Collazo & Keil LLP is a limited liability partnership of the State of New York, and has an address of 747 Third Avenue, New York, New York 10017, whose attorneys are not licensed to practice law in New Jersey.

21.     John Does (1-25), said names being fictitious, are board members of NDI and/or otherwise engaged in conduct in the Complaint herein which caused and/or contributed causing damages to the plaintiffs.

## FACTS PERTINENT TO ALL COUNTS

### A.     Background.

22.     Ms. Eisenberg began working for defendant NDI in 2007 while in college, at which time she was involved in its teacher training program.

23.     In 2007-2008, Ms. Eisenberg moved to New Mexico and worked with NDI's affiliate program.

24.     In 2008, Ms. Eisenberg returned to New York City where she began working part time as an NDI teaching assistant.

25.     Ms. Eisenberg had many great years of collaborating, choreographing, working with kids all around New York City, Jersey City, and at residencies in other locations, with a positive employee review at the end of each teaching year, while maintaining stellar relationships with all colleagues and partner schools.

26.     Ms. Eisenberg was switched to full time salary, and she was involved in writing curriculum (notably for early childhood and sequential programs), training and mentoring teachers within the organization, and training for other organizations and at conferences on NDI's behalf.

27.     During some of such time, including at all times during which defendants discriminated against and defamed her, as set forth below, Ms. Eisenberg was known by

defendants to have a company known as BOLD Arts, which provides dance and art programming for children mainly during the summers, when work with NDI was slow, with which several of her NDI colleagues worked, such that there was professional overlap between Ms. Eisenberg's work at NDI and her known additional professional work at BOLD Arts.

**B.     The NDI Employee Handbook.**

28.     The 2020 and 2021 school years were virtual, much of which time Ms. Eisenberg was a New Jersey resident.

29.     NDI issues the NDI Employee Handbook (the "Handbook") to all employees which is "to serve as a continuing guide to all current employees," and which "describes NDI's policies, procedures …"

30.     The Handbook defines "workplace" as being "the location at or from which the employee performs the duties of his or her NDI employment."

31.     As a result, during most of the 2020 and 2021 school years, Ms. Eisenberg's workplace was in New Jersey, such that she was entitled to New Jersey's employment protections.

32.     In 2020, Ms. Eisenberg helped NDI quickly pivot to virtual teaching and created virtual content for the organization and worked from home in New Jersey without difficulty. Indeed, Ms. Eisenberg turned much of her home into a virtual recording studio which impacted her life, and that of her family, in order to help keep NDI afloat during the pandemic.

33.     The Handbook provides, in pertinent part, that harassment includes "unwelcome verbal or physical conduct that: "Denigrates or shows hostility or aversion toward an individual because of the individual's actual or perceived race … sex (including pregnancy, childbirth, or a related medical or common condition) … disability, marital status, familial status … or any other characteristic protected by applicable federal, state, or local laws (including, but not limited to, all

protected characteristics expressly listed in the section of this handbook describing NDI's policy of Equal Employment Opportunity)...(2) Has the purpose or effect of creating an intimidating, hostile, or offensive work environment, has the purpose or effect of unreasonably interfering with an individual's work performance, or otherwise adversely affects an individual's employment opportunities."

34.     The Handbook includes, among other things, the following as being examples of harassing conduct: "negative stereotyping", "intimidating, or hostile acts", "or circulating written ... or verbal messages through any means (including but not limited to, including but not limited to bullying memos, e-mail, or voicemail) that denigrate or show hostility or aversion toward an individual or group."

35.     Section 1.4 of the Handbook concerns Equal Employment Opportunity", including that "Our policy is to select, place, train and promote the best-qualified individuals based upon relevant factors such as work quality, attitude and experience."

36.     Section 1.4 further provides, in pertinent part, "we do not discriminate on the basis of race ... disability, marital status, familial status ...   predisposing genetic characteristics, or any other factor protected by applicable federal, state or local laws."

37.     Section 1.4 further provides, in pertinent part, "This policy applies to all applicants and employees. It also applies to all terms and conditions of employment, including without being limited to ... transfer, disciplinary action and termination."

38.     Section 1.4 also provides, in pertinent part: "Our policy also applies to daily interactions within the workplace. Hostile or offensive actions which take on a pattern of harassment and which are directed unlawfully toward a group defined by: race ... color ... disability ... marital status ... familial status ...predisposing genetic characteristics or any other

factor protected by applicable federal, state or local laws, are not acceptable and subject the person engaging in such conduct to immediate disciplinary action and possible dismissal."

39.     With regard to reporting, the Handbook provides, in pertinent part: "NDI strongly urges employees to report all incidents of discrimination, harassment, or retaliation, regardless of the offender's identity or position." Individuals who believe they have experienced conduct that is contrary to NDI's policy, who have observed an incident that they believe violates this policy …or who have concerns about such matters should report this information as soon as possible to: their immediate supervisor, the Executive Director, the Manager of Finance & Human Resources, [or] any other manager."

40.     Such section of the Handbook continues: "Employees are not required to file a complaint with their supervisor before bringing such matters to the attention of one or the other individuals identified above. While there is no limitation on reporting such conduct, NDI strongly encourages employees to promptly report complaints and concerns so that the matter can be investigated as soon as possible.

41.     Such section of the Handbook further provides, in pertinent part, "Managers and supervisors who receive a complaint or become aware (directly or indirectly) of possible … unlawful harassment, discrimination, retaliation, or other violations of NDI's Equal Employment Opportunity and Anti-Harassment Policies, or who otherwise have concerns about any behavior that could be considered a violation of these policies, must promptly notify the Executive Director. Failure to do so may result in disciplinary action up to and including termination of employment."

C.     **NDI Creates a Hostile Work Environment Based on Race, and Miss Eisenberg Reports Related Harassment.**

42.     Beginning in 2020, NDI, a dance institution, for reasons unclear to Ms. Eisenberg, began holding training courses related to race issues in full staff settings, specifically promoting

"critical race theory" ("CRT").  CRT is a political, social, and legal philosophy that social and government institutions inherently perpetuate racial oppression.

43.     NDI to divide their racial training sessions, which promoted concepts of racial guilt and victimization, by segregating white employees from everyone else.  Specifically, NDI segregated the employees into two defined groups: the "White Affinity Group" ("WAG") and the "Black Indigenous People of Color" group ("BIPOC").  NDI, rather than the employees, chose which group to which the individual employee would be assigned.

44.     Being Caucasian with so-called "white" skin color, Ms. Eisenberg was only allowed to participate in the WAG, and the courses in which she participated  largely focused on how white people were inherently racist, and that so-called white individuals should bear guilt for their whiteness, based on the theory of racial privilege.

45.     BIPOC, on the other hand, fostered a sense of people being pitted against each other, whether it be so-called non-white people against so-called white people, or so-called non-white people against other so-called non-white people who enjoyed more relative so-called racial privilege

46.     Ms Eisenberg believed that NDI's segregating its employees by race was not only unlawful, highly inappropriate, divisive, and counter-productive, but she failed to understand its relevance in a dance institution and with the performance of her job as a dance instructor. Ms. Eisenberg expressed to defendant Lee her discomfort with the race classes and being racially segregated, to which Lee claimed in an email that there would be no retaliation if Ms. Eisenberg elected to not participate.

47.     The "courses" were "taught" by an ill-titled "anti-racist coach", Mary Pender Greene, a licensed clinical social worker not employed by NDI, and the resulting atmosphere

within NDI began to undertake a previously unseen tone of racial hostility, and race-based assignments.

48.     Upon information and belief, the race courses were intended to be for the "benefit" of Ms. Eisenberg and all other staff, and were paid for in whole or in part with federal funds.

49.     Also upon information and belief, Ms. Pender Greene's contract to teach the racially discriminatory material which stereotyped people of all races, including so-called "people of color" who were being told, in essence, that they never could achieve their full potential due to white racism against them, was paid for, in whole or in part, with federal funds.

50.     The Pender Greene "lessons" were really just indoctrination of political race-based themes which violated NDI's written policies as set forth in the Handbook, among other things, and led to employment decisions including the payment of staff, which in whole or in part was paid for with federal funds,  and the provision of services, including those which were supposed to be taught by Ms. Eisenberg which also, in whole or in part, were federally funded,  were now being determined by race.

51.     For instance, one Latina teacher who had excellent qualifications was moved from a Harlem area school because she did not have so-called black skin, and was replaced by a so-called black-skinned teacher, a move that was patently based on skin color. Such conduct by NDI violated its own policies as set forth in the Handbook, among other things.

52.     On June 24, 2020, a letter went out to all NDI staff by Calia Marshall which sought universal staff support for her petition to the DEI Board Committee which praised NDI for having a BIPOC caucus (the "BIPOC petition") which "has provided us with tremendous support as individuals, tools as teachers and administrators, and skills as we unpack the deep racial work we all believe needs to happen for NDI…"

53.    The BIPOC petition continued many racially-charged statements seeking and asserting, among other things, "yearly all staff training focused on racial equity utilizing both external vendors and our own internal team"; noting that "NDI's Board of Directors is predominantly white" and thus requesting that the Board of Directors reach "out to BIPOC staff and community partners" and "Engage more philanthropists of color"; complaining that "basic style and methodology of NDI comes out of ballet, which is a style of dance based on Eurocentric framework," and that "our methodologies are based on white cultural norms" such that NDI's movement style should be adjusted; "Create opportunities for high-profile events in non-white spaces".

54.    NDI then insisted on racially segregating the signatures thereon. The BIPOC petition was thus to be signed by "non-white" individuals first, and then was to have the signatures of so-called white NDI employees under the banner, "Co-signed by our white colleagues." Ms. Eisenberg believed this segregation of signatures and NDI only permitting white employees to sign last was to make "white colleagues" feel inferior as they were being treated with a greater moral scrutiny simply because of their race.

55.    The BIPOC petition was emailed to all NDI staff over NDI's server and requested "support from the entire staff, so that we may let the board know that we are united front in shifting the culture and practices of NDI toward one that will live out our new equity statement," and asked for signatures on the racially divisive BIPOC petition by 8:00 p.m. that evening.

56.    Ms. Eisenberg did not sign the BIPOC petition, as she was very uncomfortable with the race-based suppositions and conclusions about people based on skin color, and felt the petition to be a thinly veiled vehicle for discrimination given its public nature, the racially segregated signatures, and the 8:00 p.m. deadline that same evening, which placed a subtle pressure on the

employees to cooperate.  Upon speaking with some of her co-workers, other employees were also becoming uncomfortable with NDI's impersonal treatment of its staff and the toxic work environment which was being created with, upon information and belief, federal funding either in whole or in part.

57.     The BIPOC petition violated NDI's policies in many ways, as did its being emailed to staff members.

58.     That evening, while on her own time, Ms. Eisenberg received a text from an African-American colleague with whom she closely worked for many years, who asked if Ms. Eisenberg had received the BIPOC petition. It was clear that such colleague knew that Ms. Eisenberg did not sign the BIPOC petition, even though the colleague was not the leader of the group, or a supervisor of Ms. Eisenberg.

59.     Thus, the fact that Ms. Eisenberg did not sign the BIPOC petition was being discussed by people who had no right or interest in knowing why or whether Ms. Eisenberg signed the BIPOC petition, which information then was used in order to harass Ms. Eisenberg to conform or, in failing to conform, to stand out as a so-called white person who would not go along with the BIPOC petition.

60.     The text of the BIPOC petition, and the fact of Miss Eisenberg's refusal to sign the BIPOC petition being shared with employees by supervisory personnel, violated policies set forth in the Handbook, among other things, as did the harassing and bullying communication by a work colleague related to Miss Eisenberg's refusal to sign the BIPOC petition,

61.     As a result of receiving the call and the BIPOC petition, in keeping with the Handbook, Ms. Eisenberg called her supervisor, Artistic Director, defendant Ellen Weinstein ("Weinstein"), to express her concern.

62.     Thereafter, in keeping with the Handbook, Miss Eisenberg, addressed a detailed email to both Weinstein and the Manager of Finance & Human Resources, defendant Rachel Lee ("Lee"), on the evening of June 24, 2020. While acknowledging that the BIPOC petition was "beautifully crafted," Ms. Eisenberg noted that she was "Uncomfortable being categorized by race in the workplace and will not sign as a 'white colleague.'"

63.     Ms. Eisenberg continued that she was "concerned that this kind of culture will create an unsafe work environment for myself and others," and that "Focusing on someone's race in the workplace, as it relates to their work, performance, job opportunities, group that they may or may not attend, etc. is a violation of federal law."

64.     Thus, with her communication, Miss Eisenberg lodged a complaint in keeping with NDI's policies as set forth in the Handbook.

65.     Shortly thereafter, Ms. Eisenberg received a letter from Lee, asserting that the two staff groups, BIPOC and WAG, have non-mandatory meetings, but noted that in the future there likely would be "annual training tied to NDI's DEI initiatives," referring to issues related to race-based education. Lee continued, "I do understand that some of the DEI discussions are very difficult and some have even required me to take time out to process and reflect on them," thus excusing race-based communications and suggesting that Ms. Eisenberg somehow was not up to racial standard in terms of appreciating the race-based "lessons" being "taught" to staff, thus further fostering a hostile work environment, all in violation of the Handbook and otherwise.

66.     Lee followed up the next day with another lengthy email to Ms. Eisenberg, asserting, among other things, that NDI created "affinity groups to discuss concerns for equity, inclusivity, and diversity as it relates to our work at NDI with children, the staff and the community. She continued by asserting that attendance at the "affinity group meetings or activities

is voluntary" and that "participation in or non-participation in any affinity group" would not be used to determine job promotions, job opportunities or job performance."

67.    At no time did Lee address the fact that the "affinity groups" were racially segregated or that they "taught" and engaged staff in racially segregated forums which, even if they did not impact job advancement, which is denied by Ms. Eisenberg, still violate law and promote a hostile work environment, including through the use of federal funding of which Ms. Eisenberg was an intended beneficiary.

68.    Upon information and belief, neither Lee nor Weinstein reported Ms. Eisenberg's complaint to NDI's Executive Director, in violation of the Handbook and otherwise.

69.    Lee's letter further directed Ms. Eisenberg to the Handbook which, she noted, includes NDI's "policy about equal employment opportunity, anti-harassment, and anti- retaliation policies and the affinity group members must adhere to those policies."

70.    Thus, Lee was fully familiar with the Handbook, but did not take action to protect Ms. Eisenberg or otherwise investigate and/or discipline the harassers and/or abusers of NDI's policies.

71.    Upon information and belief, defendant Lee did nothing to investigate how or why Ms. Eisenberg's colleague learned that Ms. Eisenberg had not signed the subject petition, or to take measures to prevent individuals from using NDI time and resources, including resources coming from federal funding, to engage in racial classification activities and to promote them to other members of staff, and no discipline was meted out against anyone for such violations of Ms. Eisenberg's workplace and other civil rights.

**D.**    **Maternity Leave and Medical Exemption.**

72.    In August 2021, Ms. Eisenberg went on maternity leave when her son was born. NDI's fiscal year runs through the end of September and Ms. Eisenberg was still on salary until then.

73.    NDI enacted a "back to work" policy, effective October 1, 2021, which required that all employees be vaccinated. Limited health and religious exemptions were being offered.

74.    The "back to work" policy specifically provided that "employees who typically work in the office are working in a hybrid model which is a combination of office and remote work," and also provided that "a staggered work schedule has been developed to mitigate the spread of COVID-19 transmission among employees working at the NDI Center."

75.    On or about October 1, 2021, Ms. Eisenberg provided a note from Richard L. Luciani, M.D., of Millburn OB-GYN Associates, P.A., dated September 30, 2021, to Lee, in which Dr. Luciani asserted that Ms. Eisenberg should delay receiving the COVID vaccine until she finished breastfeeding. Ms. Eisenberg also spoke with the Artistic Director for a catch-up by telephone, wherein it was discussed that Ms. Eisenberg's maternity leave was supposed to end Jan 1, 2022.

76.    While on maternity leave and without consulting or informing Ms. Eisenberg, NDI reassigned one of the schools at which she taught for ten years to another teacher. Upon information and belief, that teacher was never informed that Ms. Eisenberg was expected to return from maternity leave in January 2022, and there was no discussion of the said replacement teacher's assignment only being temporary in nature, such that, upon information and belief, such reassignment was done in advance of Ms. Eisenberg's pre-planned retaliatory termination.

77.    Subsequently, NDI accepted Ms. Eisenberg's medical exemption while she was breastfeeding her baby and still on maternity leave.

**E.    Defendants' Refuse a Reasonable Accommodation Based in Whole or in Part in Racial Antipathy Toward Ms. Eisenberg.**

78.    On November 23, 2021, in anticipation of her return to work, Ms. Eisenberg wrote an email to Lee and Weinstein, as well as defendant Kay Gayner ("Gayner"), who had become Artistic Director and, thus, Ms. Eisenberg's direct supervisor, wherein Ms. Eisenberg noted that she had a medical exemption, and wanted to raise "what's possible regarding remote employment for the rest of the school year." Ms. Eisenberg specifically raised issues of whether she could "support international/virtual programming, be involved with any virtual teacher training, or support administratively."

79.    In December 2021, New York City Mayor deBlasio issued an Emergency Executive Order which provided that all teachers working directly with students in New York City had to be vaccinated (the "EEO").

80.    The subject Emergency Executive Order (the "EEO") was, upon information and belief, illegal and unenforceable since, among other reasons, (a) in September 2021, Mayor deBlasio's senior advisor for public health admitted, under penalty of perjury, that the pandemic no longer was an emergency, but rather, only was a public health concern; (b) Mayor deBlasio did not have legal authority pursuant to state and local laws to issue the Emergency Executive Order including, but not limited to, New York Executive Law §§24 and 28, and New York City Administrative Code §3-107; (c) compulsory vaccination violates individuals' right of refusal to be injected with emergency use vaccines without adverse consequence for such refusal, including, without limitation, pursuant to 21 U.S.C. §360bbb and 45 C.F.R. § 45.116(b)(8); and/or (d) it otherwise was unconstitutional.

81.     Lee called Ms. Eisenberg in response to her November 23, 2021 email, and refused to offer any accommodation beyond unpaid leave without pay.

82.     Such decision was made although Ms. Eisenberg had been able to fulfill her duties from home during COVID and still could do so, and otherwise was able to undertake other work activities, such as curriculum writing, Lee refused to accommodate Ms. Eisenberg's request to work from home.

83.     Lee's refusal to offer a reasonable accommodation to Ms. Eisenberg was based, in whole or in part, on her racial antipathy toward Ms. Eisenberg for having refused to sign the BIPOC petition and for having send a written complaint regarding same pursuant to the Handbook.

84.     As a result thereof, Lee's refusal to grant an accommodation beyond unpaid leave was retaliatory for Ms. Eisenberg having exercised her rights in keeping with the Handbook.

85.     Upon information and belief, Lee's refusal was approved by some or all other defendants who bore similar animosity and retaliatory fervor toward Ms. Eisenberg.

86.      During such conversation with Lee, as will be further detailed below, Ms. Eisenberg's husband, plaintiff Tau Braun ("Dr. Braun") got involved in such conversation.

87.     Dr. Braun's experience and training in workplace rights and responsibilities include a Doctorate in Education with a concentration in Organizational Leadership. His research and doctoral thesis focused on Workplace Violence Prevention, including policies and procedures that mitigate against workplace harassment, discrimination, incivility, workplace bullying, and retaliation. Dr. Braun has had substantial training in Workplace Violence, Threat Management, and Conflict Resolution, and is considered a subject matter expert in Workplace Violence Prevention and Response. Dr. Braun advises and trains educational institutions, healthcare

facilities, corporations (including Fortune 100 and 500 companies), and both state and federal government organizations in Violence Prevention Strategies.

88.     When he got involved in the conversation, and in the presence of Ms. Eisenberg, Dr. Braun advised Lee, based on his extensive education, training, and experience, that what she was doing was illegal, among other things.

89.     Thereafter, on December 10, 2021, defendants Soloman, Weinstein, and Kay sent a lengthy email to Ms. Eisenberg, and again refused to accommodate her beyond offering her unpaid leave with no benefits until Ms. Eisenberg became fully vaccinated. Such unpaid leave was only offered for three months, such that the "accommodation" amounted, in effect, to an unofficial termination before the actual termination would come if Ms. Eisenberg intended to continue breastfeeding and, thus, not get vaccinated.

90.     Upon information and belief, all defendants including, but not limited to, John Does 1-25, agreed with such decision with respect to Ms. Eisenberg

91.     Such decision was based, in whole or in part, on racial animus, marital status, predisposing genetic characteristics, and/or other factors protected by applicable federal and/or state and/or local laws including, but not limited to, violation of 21 U.S.C. §360bbb and 45 C.F.R. § 45.116(b)(8), by some or all of the defendants including, but not limited to, John Does 1-25.

92.     Further, in sharing her private medical information with individuals including, but not limited to, Solomon, defendants breached Ms. Eisenberg's medical privacy rights, in violation of the Health Insurance Portability Act of 1996 (HIPPA).

F.     **Tau Braun's Involvement in the December Phone Call with Defendant Lee.**

93.     During the phone call with Lee, Dr. Braun overheard the conversation and believed that Lee's purported accommodation, particularly in light of the prior issues involving racially

segregated and charged "training", was illegal. His exchange with Lee thus became somewhat contentious when he interjected to advise that her and NDI's conduct was illegal.

94.     Ms. Eisenberg interjected and apologized for the tone used by Dr. Braun but stood by the content of her husband's comments, in light of his expertise and the failure of NDI to give Miss Eisenberg a reasonable accommodation under all the circumstances.

95.     Lee was an appropriate person for Ms. Eisenberg to lodge a complaint of illegal activity by NDI. Despite her so logging the complaint with Lee, upon information and belief, Lee did not do anything to seek further investigation into the practices which Ms. Eisenberg reasonably believed to be illegal, and instead, joined in or otherwise remained silent as NDI and other defendants retaliated against her, in whole or in part, for so reporting NDI's illegal conduct to Lee.

96.     Indeed, in an email of December 10, 2021, on behalf of NDI, Soloman, Weinstein, and Gayner, on behalf of NDI, not only refused to grant an accommodation to Ms. Eisenberg, but asserted that Dr. Braun's telephonic communication with Lee was "unprofessional and completely unacceptable and [was] against NDI's anti-harassment policy," even though Dr. Braun was not an NDI employee.

97.     In a follow-up email to the said defendants, also on December 10, 2021, Ms. Eisenberg responded, noting that her medical exemption was being ignored, and that she could contribute in many ways other than just in the classroom, including some she had performed in the past. Ms. Eisenberg also noted that her call with Lee simply consisted of Ms. Eisenberg believing that she had constitutional rights that were being violated by NDI's refusal to recognize her medical exemption, that NDI was violating her right to bodily autonomy, and that her decision related to such concerns should not cause her to lose her job, none of which was a personal attack on Lee.

98.     As of December 15, 2021, NDI did not further respond to Ms. Eisenberg, thus she followed up with an email inquiring as to whether she could expect a response before the holidays.

99.     On December 17, 2021, Soloman, Gayner, and Weinstein again wrote an email to Ms. Eisenberg, and again asserted that "We remain concerned that your conduct toward Rachel [Lee] during the prior telephone discussion, and the conduct of your husband during the call, has not yet been addressed or acknowledged…" They then noted that NDI was in consultation with its attorneys, who advised that NDI is required to comply with New York law, even though "your employment in New Jersey may be subject to different requirements than we have in New York …" Further, said defendants wrote, "We are … not dictating your personal health care decisions or how you choose to care for your child. We have not terminated your employment relationship with NDI …"

100.    Ms. Eisenberg responded on December 22, 2021, noting that she previously "requested a conversation with you, Kay and Ellen, to explore artistic possibilities. I did not feel that Rachel was exploring options, but just stating policies in a very black and white way." Ms. Eisenberg also noted that Solomon was removed from her communication since she did not understand "why a board member is being included in a discussion about my work, medical information, and an accusation of harassment…"

101.    Thereafter, communications between the parties between December 29 and 30, 2021, wherein it was confirmed that despite her having a medical exemption, the only "reasonable accommodation" NDI would offer was "in the form of an unpaid leave of absence."

102.    On January 2, 2022, Ms. Eisenberg emailed Gayner and Weinstein that the New York Department of Education was accepting medical and religious exemptions which provided for unpaid leave with benefits through September 2022. Ms. Eisenberg noted that Lee had told her

that she was "the only one with an exemption at this time," and "would it truly cause financial strain or duress to keep me employed and on salary?"

**G.    Defendants Engage in Further Retaliation Against Ms. Eisenberg.**

103.    Following the January 2, 2022, email from Ms. Eisenberg, NDI only would communicate with Ms. Eisenberg through its attorney, defendant John P. Keil, Esq. ("Keil"), of the defendant law firm Collazo & Keil LLP (the "Firm").

104.    Neither Keil, nor anybody in the Firm, is licensed to practice law in New Jersey, yet were acting in either a full or a quasi-attorney capacity in engaging with Ms. Eisenberg on behalf of NDI and, thus, were practicing law without a license in New Jersey.

105.    The Keil Defendants should have withdrawn at that point, and advised NDI that it had to retain New Jersey counsel, but they did not do so, such that they affirmatively sought to practice law in New Jersey without a license.

106.    Keil The Keil Defendants took on the role of human resources administrators for NDI and, thus, fostered and participated in the discriminatory conduct undertaken by NDI, such that they enabled the same and acted as agents for NDI in furtherance of their illegal racial and medical discrimination, since their work crossed over from legal to human resources.

107.    The Keil Defendants represented NDI under a contract, express or implied, and their services were paid for by NDI, in whole or in part, with funds received from NDI by the federal government. Under the circumstances of NDI's illegal conduct, Ms. Eisenberg was, or should have been, a beneficiary of such funds, since the Keil Defendants should have advised NDI that its conduct was illegal, and that Ms. Eisenberg had to be accommodated, and could not be fired under the circumstances.

108.    On January 7, 2022, Keil wrote a letter on behalf of the Firm affirming that an accommodation would not be made for Ms. Eisenberg if she remained unvaccinated, without any consideration given to her medical exemption and the potential risks involved to her baby in light of her breastfeeding the baby. Thus, Keil and the Firm offered Ms. Eisenberg a three month leave of absence without pay as the only "accommodation" and demanded a response by January 12, 2022.

109.    In an email response the same day, Ms. Eisenberg asked Keil and the Firm whether NDI was accepting her medical exemption, which was related to a past reproductive issue, and that her doctor felt that she should not be vaccinated if she was breastfeeding. Ms. Eisenberg also noted that "NDI is aware that I was treated at Memorial Sloan Kettering for over a year, and that "employers and board members do not typically have the right or need to their employees' comprehensive medical history, beyond what is necessary as it related to ability to work and work performance."

110.    In his response the next day, the Keil Defendants immediately asserted that "you still have not acknowledged or apologized for your prior mistreatment of defendant Lee, which NDI regards as a serious issue. Your conduct will not prevent a response to your medical request, but it will have to be addressed before you return to work at NDI." The Keil Defendants then reiterated that the only "reasonable accommodation" was leave without pay.

111.    On February 3, 2022, Ms. Eisenberg responded and noted, among other things, that she typically works in residency in the Catskills, which is not subject to the New York City Department of Education's vaccination policies, and asked whether she should hold such dates given her medical exemption. Finally, Ms. Eisenberg noted that she never had an opportunity to

explain the phone call with Lee, if such call had generated an "official claim [of harassment] in my record."

112.    On February 5, 2022, Keil responded without substantively addressing the issue of the Catskills residency. Instead, he asserted that, concerning Ms. Eisenberg's call with Lee, "NDI believes corrective action is warranted because the way Ms. Lee was treated during that call in December was unacceptable. A memo has not yet been placed in your personnel file regarding the incident because the organization has been waiting for you to acknowledge what happened and provide some meaningful assurance, to Ms. Lee and to NDI, that no one in the NDI community would be treated in such a manner going forward. The level of corrective action NDI thinks is appropriate will probably depend, to a very large extent, on what you choose to say about the matter." Keil then invited Ms. Eisenberg to make a written statement *to him*, which would then be considered by NDI, thus firmly placing the Keil Defendants in the middle of the human resources issues involving Ms. Eisenberg.

113.    After Ms. Eisenberg again sought guidance on whether she should be preparing for the Catskills summer work, Keil again responded, this time on February 14, 2022, asserting that Ms. Eisenberg should not be doing any work since she was on unpaid leave, and scolded Ms. Eisenberg that "In the meantime, you do not seem to be taking seriously NDI's reluctance to let you resume work responsibilities until the incident with Ms. Lee from last December has been addressed. If you intend to submit a statement regarding that matter, please do so today. If you are unable to provide a statement today but intend to provide one, please explain the delay and when it can be expected. Otherwise, NDI will proceed to a decision."

114.    On February 14, 2022, Ms. Eisenberg responded that she felt harassed by Keil and "that you represent NDI as an extension of trying to get me to resign, which I do not plan to do."

Ms. Eisenberg further noted that she would not admit harassment of a colleague, that she already gave her response to the matter in December and had demonstrated a willingness to meet with supervisors over the course of the month, but that they chose not to do so. Thus, she noted that Keil was "reinforcing the lie that there was harassment …" Ms. Eisenberg noted that she was raising a concern about NDI violating the law and corporate policies at the time of her call, which is appropriate under the law and per company policy.

**H.   Termination and Defamation.**

115.   On February 22, 2022, NDI, via defendant Escalante, terminated Ms. Eisenberg's employment "based on the abusive treatment that you *and your husband* subjected Rachel Lee to during a telephone conference on December 2, 2021 …" (emphasis added).

116.   On February 22, 2022, Escalante wrote an email to the staff of NDI that "effective immediately, Jennifer Eisenberg is no longer associated with NDI …", which was reiterated by him in a subsequent email of February 25, 2022.

117.   On February 26, 2022, Escalante and Gayner sent an email to at least one employee concerning Ms. Eisenberg's termination from employment, writing that "We can say we parted ways because Jenn had a very unprofessional interaction with another one of our staff members, which is just unacceptable … we can assure you that multiple opportunities were given during the past three months to rectify the damage that was caused to NDI, and Jenn decided not to take actions accordingly."

118.   The email went on, "We would like to take this opportunity to assure you that under our leadership, everyone, regardless of tenure, will be treated with respect and fairness, and that we will always put the organization first. At the same time, we believe that actions have consequences and that all of our staff deserve to be protected from unprofessional interactions."

119.    Additionally, on or about February 25, 2022, defendants Escalante and Gayner wrote to one of Ms. Eisenberg's colleagues from NDI, who also was a BOLD Arts employee, a letter discussing Ms. Eisenberg, which included the following false statement: "We can say that we parted ways because Jenn had a very unprofessional interaction with another one of our staff members, which is just unacceptable.  Although we are not at liberty to discuss details of a personnel matter, we can assure you that multiple opportunities were given during the past three months to rectify the damage that was caused to NDI, and Jenn decided not to take actions accordingly."

120.    Such statement was made individually and on behalf of NDI, was false, concerned Ms. Eisenberg, was published to a third party as if it was a fact, and concerned Ms. Eisenberg in her profession, such that is constitutes libel *per se*.

121.    Upon information and belief, such defendants and perhaps others wrote and said similar or the same things to other employees, with each such defamatory statement and publication constituting defamation *per se*.

122.    All of the above referenced comments with respect to Ms. Eisenberg and Mr. Braun were false, misleading, defamatory, and cast Ms. Eisenberg and Dr. Braun in a false light with respect to their professional interactions and in matters associated with their profession, thus causing them damage.

123.    All of the acts of defendants noted above have directly and proximately caused Ms. Eisenberg to suffer, without limitation, extreme emotional distress, lost wages and benefits, and damage and/or loss of her professional reputation.

## COUNT I

### (Title VI Intentional Racial Discrimination In a Federally Funded Educational Program.)

124.    The plaintiffs repeat and reassert each and every allegation above as if fully set forth herein at length.

125.    Ms. Eisenberg is a "person" as defined by 42 U.S.C. § 2000d *et seq.* and was subjected to discrimination on the ground of race and color, including racial segregation in the workplace.

126.    Ms. Eisenberg was an intended beneficiary of federal funding of NDI, including, but not limited to, in the application of such funding to curricula, direct and third-party programming, curricula, professional services, and staffing via contract or otherwise.

127.    Defendants treated similarly situated persons differently with respect to race, color, and support or opposition to political issues related to race and color in such areas and in others.

128.    NDI receives federal funding for its educational programming and/or for those providing such indoctrination directly and/or through contractual arrangements, and its acts as aforesaid, including entry into one or more contracts which resulted in perpetuation of racial stereotypes, caused harm to all staff members and students they teach including, but not limited to, Ms. Eisenberg.

129.    Defendants so acted, without limitation, by explicitly and/or implicitly adopting policies which were designed to discriminate against individuals because of their race and/or color, which policies are damaging to all staff members and students in that they promote racial stereotypes.

130.    Defendants so acted, without limitation, by explicitly discriminating against those who opposed the racially discriminatory policies of NDI and the individual defendants, or some

of them, by favoring those who supported and/or promoted such racially discriminatory policies and/or implementation of additional racially discriminatory policies.

131.    To the extent that defendants' conduct may have been motivated, in whole or in part, by benign or putatively positive motives, the racially discriminatory acts which occurred, and/or which were undertaken, promoted, and/or ignored, were not supported by a compelling government interest in remedying the effects of past discrimination and/or were not narrowly tailored so as to remedy such effects if they existed.

132.    At the time they engaged in such acts, NDI and the individual defendants knew that there had not been any legal finding that NDI had engaged in any racially discriminatory acts which had occurred, and for which remedial activity was required or necessary. Thus, such acts were gratuitous and motivated by a desire to discriminate against individuals and groups of individuals based on their so-called "whiteness", and to hold them in disrepute, which simultaneously diminished so-called "non-white" people by suggesting or affirmatively asserting that they were incapable of advancing to their highest and best selves because of the fraudulent notions of inherent white racism which were illegally being promoted, all of which caused damage to Ms. Eisenberg and others as aforesaid, and which created a hostile work environment.

133.    By their acts and statements, defendants, or some of them who were decision-makers, expressed discriminatory motives for their conduct, and the sequence of events leading to their conduct evidenced discriminatory intent which constituted a departure from normal policy and procedure.

134.    For the reasons aforesaid, defendants have violated Title VI of the Civil Rights Act, which violations are ongoing, and are proximately causing damage to Ms. Eisenberg.

135.   Defendant NDI receives federal financial assistance in its programing which in part pays salaries of its teaching staff, which included Ms. Eisenberg.

136.   NDI had substantial control over the work environment and promoted and engaged in, and had actual knowledge of, severe and discriminatory racial harassment and discrimination by virtue of their promotion of racially segregated employee and peer groups of which it had notice, and assigning teachers to various locations based on the teachers' race, but which it refused and failed to correct, thus constituting deliberate indifference to severe and discriminatory racial harassment against Ms. Eisenberg and others.

137.   By engaging in race-based employee groupings and seminars placing Ms. Eisenberg and others in a situation where she was being identified and diminished because of her race, and otherwise engaging in inappropriate and retaliatory race-based conduct as aforesaid, NDI violated 42 U.S.C. § 2000d *et seq.* and caused Ms. Eisenberg damage.

WHEREFORE, Ms. Eisenberg demands Judgment in her favor, and against defendant NDI, as follows:

A.   Awarding compensatory damages;

B.   Awarding punitive damages;

C.   Restraining and enjoining NDI, or anyone acting under it, from applying for or receiving federal funds for the school district until such time as it remedies its racially discriminatory practices;

D.   Restraining and enjoining NDI, or anyone acting under it, from funding, teaching, or otherwise supporting, overtly or covertly, any program that violates Title VI including, but not limited to, programs making claims about "white privilege", implied racism by

individuals based on their race or color, and implied systemic injustice based upon skin color and race;

E.  Appointing an independent third-party administrator who shall audit all NDI workplace activities and curricula to ensure compliance with Title VI, and to ensure that administrators and staff within NDI are annually trained on how not to violate Title VI by using racial and skin color classifications, and generalized concepts about the perceived racial superiority or inferiority of individuals based on race and color;

F.  Restraining and enjoining NDI, or anyone acting under it, from violating the Handbook in order to discriminate against individuals in violation of the Constitution and laws of the United States of America;

G.  Awarding the plaintiffs all legal fees and costs incurred in vindicating their rights with respect to Title VI violations;

H.  Awarding interest as allowed by law;

I.  Awarding such other and further relief as may be equitable and just.

### COUNT II

### (New Jersey Law Against Discrimination - Race)

138.   The plaintiffs repeat and reassert each and every allegation above as if fully set forth herein at length.

139.   Defendants engaged in discrimination against Ms. Eisenberg in the terms and conditions of her employment on the basis of her race in violation of N.J.S.A. 10:5-1 *et seq.*, the New Jersey Law Against Discrimination ("LAD"), despite her working up to the expectations of her job.

140.    Defendants suspended, demoted and/or terminated Ms. Eisenberg based on and directly related to such discriminatory criteria, and thus caused her damages.

141.    Defendants' actions as aforesaid were especially egregious, and defendants through upper management actually participated in, or were willfully indifferent to, the aforesaid wrongful conduct.

142.    The individual defendants engaged in such actions on their own behalf, and on behalf of NDI, and did so with the knowledge and support of NDI, which is liable for their actions.

143.    By such actions, defendants proximately caused Ms. Eisenberg to suffer damages including, but not limited to, economic damages, consequential damages, and physical damages which include, but are not limited to, emotional distress.

WHEREFORE, Ms. Eisenberg demands Judgment in her favor, and against defendants, jointly and severally, NDI, as follows:

A.    Awarding compensatory damages;

B.    Awarding punitive damages;

C.    Awarding all costs of suit, including reasonable attorneys' fees and costs;

D.    Awarding interest as allowed by law;

E.    Awarding such other and further relief as may be equitable and just.

### COUNT III

### (New Jersey Law Against Discrimination-Hostile Work Environment)

144.    The plaintiffs repeat and reassert each and every allegation above as if fully set forth herein at length.

145.    Defendants created a hostile work environment through their individual acts and on behalf of NDI.

146.  By such actions, defendants violated the LAD, and caused Ms. Eisenberg damages.

147.  Defendants' actions as aforesaid were especially egregious and defendants through upper management actually participated in, or were willfully indifferent to, the aforesaid wrongful conduct.

148.  By such actions, defendants proximately caused Ms. Eisenberg to suffer damages including, but not limited to, economic damages, consequential damages, and physical damages which include, but are not limited to, emotional distress.

WHEREFORE, Ms. Eisenberg demands Judgment in her favor, and against defendants, jointly and severally, NDI, as follows:

A.  Awarding compensatory damages;

B.  Awarding punitive damages;

C.  Awarding all costs of suit, including reasonable attorneys' fees and costs;

D.  Awarding interest as allowed by law;

E.  Awarding such other and further relief as may be equitable and just.

## COUNT IV

### (New Jersey Law Against Discrimination - color)

149.  The plaintiffs repeat and reassert each and every allegation above as if fully set forth herein at length.

150.  Defendants discriminated against Ms. Eisenberg by their individual acts and on behalf of NDI, based on Ms. Eisenberg's color.

151.  Defendants' actions as aforesaid were especially egregious and defendants through upper management actually participated in, or were willfully indifferent to, the aforesaid wrongful conduct.

152.   By such actions, defendants proximately caused Ms. Eisenberg to suffer damages including, but not limited to, economic damages, consequential damages, and physical damages which include, but are not limited to, emotional distress.

WHEREFORE, Ms. Eisenberg demands Judgment in her favor, and against defendants, jointly and severally, NDI, as follows:

A.   Awarding compensatory damages;

B.   Awarding punitive damages;

C.   Awarding all costs of suit, including reasonable attorneys' fees and costs;

D.   Awarding interest as allowed by law;

E.   Awarding such other and further relief as may be equitable and just.

## COUNT V

### (New Jersey Law Against Discrimination - Disability)

153.   The plaintiffs repeat and reassert each and every allegation above as if fully set forth herein at length.

154.   Defendants perceived Ms. Eisenberg to be suffering with a disability based on her pregnancy, breastfeeding, and/or vaccination status, all in violation of Ms. Eisenberg's rights.

155.   Defendants' actions as aforesaid were especially egregious and defendants through upper management actually participated in, or were willfully indifferent to, the aforesaid wrongful conduct.

By such actions, defendants proximately caused Ms. Eisenberg to suffer damages including, but not limited to, economic damages, consequential damages, and physical damages which include, but are not limited to, emotional distress.

WHEREFORE, Ms. Eisenberg demands Judgment in her favor, and against defendants, jointly and severally, NDI, as follows:

      A.     Awarding compensatory damages;

      B.     Awarding punitive damages;

      C.     Awarding all costs of suit, including reasonable attorneys' fees and costs;

      D.     Awarding interest as allowed by law;

      E.     Awarding such other and further relief as may be equitable and just.

## COUNT VI

### (New Jersey Law Against Discrimination - Predisposing Genetic Characteristics)

156.    The plaintiffs repeat and reassert each and every allegation above as if fully set forth herein at length.

157.    Defendants discriminated against Ms. Eisenberg by their individual acts and on behalf of NDI, based on Ms. Eisenberg's Predisposing Genetic Characteristics related to her vaccination status.

158.    Defendants' actions as aforesaid were especially egregious and defendants through upper management actually participated in, or were willfully indifferent to, the aforesaid wrongful conduct.

159.    By such actions, defendants proximately caused Ms. Eisenberg to suffer damages including, but not limited to, economic damages, consequential damages, and physical damages which include, but are not limited to, emotional distress.

WHEREFORE, Ms. Eisenberg demands Judgment in her favor, and against defendants, jointly and severally, NDI, as follows:

      A.     Awarding compensatory damages;

    B.     Awarding punitive damages;

    C.     Awarding all costs of suit, including reasonable attorneys' fees and costs;

    D.     Awarding interest as allowed by law;

    E.     Awarding such other and further relief as may be equitable and just.

## COUNT VII

### (New Jersey Law Against Discrimination - Marital Status)

160.    The plaintiffs repeat and reassert each and every allegation above as if fully set forth herein at length.

161.    Defendants discriminated against Ms. Eisenberg by their individual acts and on behalf of NDI, based on Ms. Eisenberg's marital status, and in particular, based her termination in whole or in part on such marital status and their dislike for her husband.

162.    By such actions, defendants violated the LAD, and caused Ms. Eisenberg damages.

163.    Defendants' actions as aforesaid were especially egregious and defendants through upper management actually participated in, or were willfully indifferent to, the aforesaid wrongful conduct.

WHEREFORE, Ms. Eisenberg demands Judgment in her favor, and against defendants, jointly and severally, NDI, as follows:

    A.     Awarding compensatory damages;

    B.     Awarding punitive damages;

    C.     Awarding all costs of suit, including reasonable attorneys' fees and costs;

    D.     Awarding interest as allowed by law;

    E.     Awarding such other and further relief as may be equitable and just.

## COUNT VIII

### (New York City Human Rights Law)

164.    The plaintiffs repeat and reassert each and every allegation above as if fully set forth herein at length.

165.    By their actions, defendants, individually and on behalf of NDI, acted in a manner to discriminate against and discharged Ms. Eisenberg because of race and perceived disability.

166.    The individual defendants exercised managerial or supervisory responsibility when discriminating against Ms. Eisenberg.

167.    NDI knew of its employees or agent's discriminatory conduct, and acquiesced in such conduct or failed to take immediate and appropriate corrective action.

168.    To the extend NDI may not have known of such discriminatory conduct by its employees and/or agents, NDI should have known of the employees' or agent's discriminatory conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct.

169.    Defendants' actions as aforesaid were especially egregious and defendants through upper management actually participated in, or were willfully indifferent to, the aforesaid wrongful conduct.

170.    Ms. Eisenberg was damaged thereby, in violation of the New York City Human Rights Law.

WHEREFORE, Ms. Eisenberg demands Judgment in her favor, and against defendants, jointly and severally, NDI, as follows:

A.    Awarding compensatory damages;

B.    Awarding punitive damages;

C.    Awarding all costs of suit, including reasonable attorneys' fees and costs;

D.      Awarding interest as allowed by law;

E.      Awarding such other and further relief as may be equitable and just.

## COUNT IX

### (New Jersey Whistleblower, N.J.S.A. 34:19-1 et seq.)

171.    The plaintiffs repeat and reassert each and every allegation above as if fully set forth herein at length.

172.    Ms. Eisenberg had a reasonable belief that defendants' racially segregatory and discriminatory workplace groupings and assignments violated law and, thus, in good faith she reported the same to her supervisors.

173.    Similarly, Ms. Eisenberg had a reasonable belief that defendants' refusal to honor her medical exemption and their attempt to compel her to be vaccinated in spite of same, and the potential risk to herself and her infant child, violated law and, thus, in good faith she reported the same to her supervisors.

174.    Such reporting by Ms. Eisenberg constituted protected whistleblower activity, pursuant to the New Jersey Conscientious Employee Protection Act, N.J.S.A. 34:19-1 *et seq.*

175.    As a result of her engaged in such protected activity, defendants, or some of them, retaliated against Ms. Eisenberg, in whole or in part, and without limitation, when refusing to accommodate her medical exemption and then terminating her.

WHEREFORE, Ms. Eisenberg demands Judgment in her favor, and against defendants, jointly and severally, NDI, as follows:

A.      Awarding compensatory damages;

B.      Awarding punitive damages;

C.      Awarding all costs of suit, including reasonable attorneys' fees and costs;

D.      Compelling her re-employment;

E.      Awarding interest as allowed by law;

F.      Awarding such other and further relief as may be equitable and just.

## COUNT X

### (Intentional Infliction of Emotional Distress - Eisenberg)

176.   The plaintiffs repeat and reassert each and every allegation above as if fully set forth herein at length.

177.   Defendants' actions as aforesaid were purposeful, willful and/or reckless, and were unacceptable in a civilized society.

178.   By such acts, defendants caused severe emotional distress to Ms. Eisenberg, resulting in their proximately causing Ms. Eisenberg damages.

WHEREFORE, Ms. Eisenberg demands Judgment in her favor, and against defendants, jointly and severally, as follows:

A.      Awarding compensatory damages;

B.      Awarding punitive damages;

C.      Awarding all costs of suit, including reasonable attorneys' fees and costs;

D.      Awarding interest as allowed by law;

E.      Awarding such other and further relief as may be equitable and just.

## COUNT XI

### (Tortious Interference with Economic Relations)

179.   The plaintiffs repeat and reassert each and every allegation above as if fully set forth herein at length.

180. The individually-named defendants and the Keil Defendants, or some of them, knew that Ms. Eisenberg maintained economic relations with NDI and, by their acts as aforesaid, purposely acted to interfere with and damage such economic relations.

181. As a result thereof, such defendants proximately caused Ms. Eisenberg damages.

WHEREFORE, Ms. Eisenberg demands Judgment in her favor, and against all defendants other than NDI, jointly and severally, as follows:

A. Awarding compensatory damages;

B. Awarding punitive damages;

C. Awarding all costs of suit, including reasonable attorneys' fees and costs;

D. Awarding interest as allowed by law;

E. Awarding such other and further relief as may be equitable and just.

## COUNT XII

### (New Jersey Civil Rights Act)

182. The plaintiffs repeat and reassert each and every allegation above as if fully set forth herein at length.

183. By their acts as aforesaid, defendants, or some of them, intentionally, recklessly, and/or negligently, interfered with and/or deprived the Ms. Eisenberg of her civil rights as aforesaid, which are protected by the United States and/or New Jersey constitutions and/or laws including, without limitation, Art. I cl. 1, Art. 1 cl. 6, Art. I cl. 21, and Art. VII, Sec.1, cl. 1 of the New Jersey Constitution, the First Amendment of the United States Constitution, the Fourteenth Amendment of the United States Constitution, and equal protection principles of the State of New Jersey which are broader than those contained in the United States Constitution.

184. Defendants proximately caused Ms. Eisenberg damages thereby.

WHEREFORE, Ms. Eisenberg demands Judgment in her favor, and against defendants, jointly and severally, as follows:

      A.    Awarding compensatory damages;

      B.    Awarding punitive damages;

      C.    Awarding all costs of suit, including reasonable attorneys' fees and costs;

      D.    Awarding interest as allowed by law;

      E.    Awarding such other and further relief as may be equitable and just.

### COUNT XIII
### (Civil Conspiracy)

185.    The plaintiffs repeat and reassert each and every allegation above as if fully set forth herein at length.

186.    Defendants, or some of them, conspired in concert, in less than the whole, and or with others including John Does 1-25, to commit one or more torts which are the subject of this action, and had a duty not to do so.

187.    In so doing, such defendants proximately caused damage to Ms. Eisenberg.

WHEREFORE, Ms. Eisenberg demands Judgment in her favor, and against defendants, jointly and severally, as follows:

      A.    Awarding compensatory damages;

      B.    Awarding punitive damages;

      C.    Awarding all costs of suit, including reasonable attorneys' fees and costs;

      D.    Awarding interest as allowed by law;

      E.    Awarding such other and further relief as may be equitable and just.

## COUNT XIV

### (Breach of Covenant of Good Faith and Fair Dealing)

188.    The plaintiffs repeat and reassert each and every allegation above as if fully set forth herein at length.

189.    NDI had a contract with Ms. Eisenberg, express or implied, whereby it was supposed to conduct itself within the bounds of law, and otherwise was supposed to act in accordance with the Handbook.

190.    NDI did not conduct itself in a manner comporting with reasonable notions of good faith and fair dealing in the performance of its contract and, thus, breached the covenant of good faith and fair dealing, express or implied, within its contract with Ms. Eisenberg.

191.    Ms. Eisenberg has suffred proximate losses as a result thereof.

WHEREFORE, Ms. Eisenberg demands Judgment in her favor, and against NDI, as follows:

A.    Awarding compensatory damages;

B.    Awarding punitive damages;

C.    Awarding all costs of suit, including reasonable attorneys' fees and costs;

D.    Awarding interest as allowed by law;

E.    Awarding such other and further relief as may be equitable and just.

## COUNT XV
### (Defamation)

192.    The plaintiffs repeat and reassert each and every allegation above as if fully set forth herein at length.

193.    Following Ms. Eisenberg's termination, defendant Escalante sent an email to all NDI employees and, perhaps, others, wherein he asserted that Ms. Eisenberg "no longer associated with" NDI.

194.    Ms. Eisenberg's colleagues were shocked and upset when they learned of the same, and begain to ask Escalante questions. Thus, Escalante falsely asserted that Ms. Eisenberg was terminated because of "unprofessional behavior toward a colleague" and that NDI had given Ms. Eisenberg time to resolved the issue, which was false.

195.    Dr. Braun was implicated in fact or by implication in such false statements such that the recipients of such information would have known that the comments were in part of and concerning Dr. Braun.

196.    Such statements by Escalante were knowingly false, and were malicious in nature.

197.    Defendants, or some of them, also falsely asserted, orally or in writing to the Keil Defendants, that Ms. Eisenberg and/or Dr. Braun had harassed an NDI employee, which was a knowingly false and malicious statement.

198.    By virtue of Defendants' libelous and defamatory statements individually, and on behalf of NDI, which implicitly or explicitly approved of such defamation, the plaintiffs were proximately caused to suffer mental anguish, emotions harm, damage to their reputations, and economic harm.

WHEREFORE, the plaintiffs demand Judgment in their favor, and against all defendants other than the Keil Defendants, as follows:

A.    Awarding compensatory damages;

B.    Awarding punitive damages;

C.    Awarding all costs of suit, including reasonable attorneys' fees and costs;

D.    Awarding interest as allowed by law;

E.    Awarding such other and further relief as may be equitable and just.

## COUNT XVI
### (Intentional Infliction of Emotional Distress - Braun)

199.    The plaintiffs repeat and reassert each and every allegation above as if fully set forth herein at length.

200.    Defendants' conduct as aforesaid with respect to Dr. Braun was so outrageous that it was beyond the bounds of a civilized society.

201.    Defendants' intentionally acted in such manner, and made such statements as to Dr. Braun in order to cause him harm and emotional distress and mental anguish.

202.    By virtue of their conduct as aforesaid, defendants, or some of them, proximately caused Dr. Braun to suffer emotional distress, mental anguish, reputation damage, and economic harm.

## JURY DEMAND

The plaintiffs demand a trial by jury of twelve persons with respect to all Counts so triable.


MURRAY-NOLAN BERUTTI LLC

s/ Ronald A. Berutti

By:_____
          Ronald A. Berutti
          100 E. Hanover Avenue, Suite 401
          Cedar Knolls, New Jersey 07927
          (908) 588-2111
          ron@murray-nolanberutti.com
          Attorney for Plaintiffs

Dated: July 12, 2022

## **VERIFICATION**

JENNIFER EISENBERG, of full age, verifies the following under penalty of perjury:

I am the plaintiff in the within matter. I have reviewed the Complaint and know the contents thereof, which I know to be true, except with respect to those acts which are not my own, which I believe to be true.

Jennifer Eisenberg

July 6, 2022

## **VERIFICATION**

TAU BRAUN, of full age, verifies the following under penalty of perjury:

I am the plaintiff in the within matter. I have reviewed the Complaint and know the contents thereof, which I know to be true, except with respect to those acts which are not my own, which I believe to be true.

Tau Braun

July 6, 2022