**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| JENNIFER EISENBERG and TAU BRAUN, | Civil Action No: 22-04521 (SDW)(CLW) |
| Plaintiffs, | **OPINION** |
| v. | April 17, 2023 |
| NATIONAL DANCE INSTITUTE, *et al.*, | |
| Defendants. | |

**WIGENTON**, District Judge.

Before this Court are the following motions:  Defendants National Dance Institute, Inc. ("NDI") and Marc Solomon ("Solomon"), Kay Gayner ("Gayner"), Ellen Weinstein ("Weinstein"), Rachel Lee ("Lee"), and Juan Jose Escalante's ("Escalante") (collectively, "Individual NDI Defendants") (NDI and Individual NDI Defendants are hereinafter the "NDI Defendants") Motion to Dismiss, (D.E. 6), Plaintiffs Jennifer Eisenberg ("Eisenberg") and Tau Braun's ("Braun") (collectively, "Plaintiffs") Complaint, (D.E. 1), pursuant to Federal Rules of Civil Procedure ("Rule") 12(b)(2) and 12(b)(6); and Defendants John P. Keil, Esq. ("Keil") and Collazo & Keil, LLP's (collectively, "Keil Defendants") Motion to Dismiss, (D.E. 19), Plaintiffs Jennifer Eisenberg ("Eisenberg") and Tau Braun's ("Braun") (collectively, "Plaintiffs") Complaint, (D.E. 1), pursuant to Federal Rules of Civil Procedure ("Rule") 12(b)(2) and 12(b)(6). Subject matter jurisdiction is proper pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343, and 28 U.S.C. § 1367.  Venue is proper pursuant to 28 U.S.C. § 1391.  This opinion is issued without oral

argument pursuant to Rule 78.  For the reasons stated herein, the NDI Defendants' Motion to

Dismiss is **GRANTED**; and the Keil Defendants' Motion to Dismiss is **GRANTED**.

## I.      FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A. Factual Background

The controversy in this action stems from circumstances preceding and following

Eisenberg's termination from employment with NDI.  (*See* D.E. 1 ¶¶ 1–8.)  To understand the

controversy, it is important to review the relevant parties involved.[1]  Plaintiffs are a married couple

residing in Westfield, New Jersey.  (*Id.* ¶¶ 4, 12.)  NDI "is a non-profit arts education organization"

that receives federal funds and is located in New York, New York.  (*Id.* 1 ¶ 13.)  Lee "is the

Manager of Finance & Human Resources of NDI," and resides in New York, New York.  (*Id.* ¶

14.)  Weinstein, who resides in New York, New York, was previously an "Artistic Director at

NDI" during a portion of the time period relevant to this claim, and has been promoted to Interim

Executive Director.  (*Id.* ¶ 15.)  Gayner was an "Artistic Director at NDI" during a portion of the

time period relevant to this claim, and resides in New York, New York.  (*Id.* ¶ 16.)  Escalante is

the "Executive Director of NDI" and resides in New York, New York.  (*Id.* ¶ 18.)  Keil is an

attorney who resides in New York, New York.  (*Id.* ¶ 19.)  Collazo & Keil, LLP is a New York-

based law firm organized as a Limited Liability Partnership.  (*Id.* ¶ 20.)

Eisenberg began working for NDI in 2007, moved to New Mexico and worked for an NDI

affiliate in New Mexico between 2007–08, and moved back to New York City in 2008, where she

took a position as a part-time teaching assistant at NDI in New York City.  (*Id.* ¶¶ 22–24.)  At

some point, Eisenberg transitioned to a full-time teaching position at NDI in New York City.  (*Id.*

---

[1] In addition to the Defendants named herein, Plaintiffs also name John Does (1–25), who "are board members of NDI and/or otherwise engaged in conduct in the Complaint . . . [,] which caused and/or contributed [to] causing damages to the [P]laintiffs."  (*Id.* ¶ 21.)

¶ 26.)  Eisenberg also had a company called BOLD Arts, which "provides dance and art programming for children mainly during" summer months.  (*Id.* ¶ 27.)

    1.  <u>CRT Training and BIPOC Petition</u>

During the pandemic in the 2020 and 2021 school years, Eisenberg taught NDI classes in a virtual setting and worked from her home in New Jersey.  (*Id.* ¶¶ 28–32.)  In 2020, NDI "began holding training courses related to race issues in full[-]staff settings, specifically promoting 'critical race theory' ('CRT')."  (*Id.* ¶ 42.)  During the training, which was taught by an "anti-racist coach" and licensed clinical social worker, Mary Pender Greene, and paid for in whole or in part by federal funds, "NDI segregated the employees into two defined groups:  the 'White Affinity Group' ("WAG") and the 'Black Indigenous People of Color' group ("BIPOC")."  (*Id.* ¶¶ 43, 47– 49.)  According to the Complaint, Eisenberg was assigned to the WAG group, "which largely focused on how white people were inherently racist, and that so-called white individuals should bear guilt for their whiteness, based on the theory of racial privilege," and the WAG and BIPOC groups were "pitted against each other, whether it be so-called non-white people against so-called white people, or so-called non-white people against other so-called non-white people who enjoyed more relative so-called racial privilege."  (*Id.* ¶¶ 44–45.)  Eisenberg told Lee that she found NDI's segregation of employees based on race "unlawful, highly inappropriate, divisive, and counter-productive" and irrelevant to her position as a dance instructor.  (*Id.* ¶ 46.)  Lee emailed Eisenberg and related that "there would be no retaliation if [Eisenberg] elected to not participate."  (*Id.*)

On June 24, 2020, the NDI staff received a letter written by an individual named Calia Marshall in which she "sought universal staff support for her petition to the DEI Board Committee[,] which praised NDI for having a BIPOC caucus (the "BIPOC petition")." [2]  (*Id.* ¶ 52.)

---

[2] The Complaint does not specify who Calia Marshall is, what her connection to NDI is, what the DEI Board Committee is, and how it functions in relation to NDI.  This Court supposes that DEI references Diversity, Equity,

The BIPOC petition sought yearly racial equity training for NDI staff, engagement of more "philanthropists of color," and "opportunities for high-profile events in non-white spaces." (*Id.* ¶ 53.) Those who signed the petition had to do so in a segregated manner, with "non-white individuals" signing first, a banner designating "Co-signed by our white colleagues," and white employees' signatures thereafter. (*Id.* ¶ 54.) The petition was sent to the entire NDI staff, and the sender requested the entire staff sign the document by 8:00 P.M. that evening and show a united front to the Board. (*Id.* ¶ 55.) Eisenberg "felt the petition to be a thinly veiled vehicle for discrimination given its public nature, the racially segregated signatures, and the 8:00 P.M. deadline that same evening, which placed a subtle pressure on the employees to cooperate." (*Id.* ¶ 56.)

Later that evening, Eisenberg "received a text message from an African-American colleague . . . who asked if [Eisenberg] had received the BIPOC petition." (*Id.* ¶ 58.) Eisenberg called Weinstein, her supervisor, to "express her concern" about the communication, and thereafter that evening lodged a complaint by "address[ing] a detailed email to both Weinsten and [Lee]," in which she expressed that "she was '[u]ncomfortable being categorized by race in the workplace and will not sign as a "white colleague",'" that "she was 'concerned that this kind of culture will create an unsafe work environment for [her]self and others,'" and that "[f]ocusing on someone's race in the workplace . . . is a violation of federal law." (*Id.* ¶¶ 62–63.) Lee sent Eisenberg a letter in which Lee put forth that the BIPOC and WAG groups had non-mandatory meetings, noted there would be annual DEI training and initiatives, and expressed that DEI discussions can be difficult. (*Id.* ¶ 65.) Lee sent another email to Eisenberg the next day communicating that "NDI created

---

and Inclusion or some derivative thereof. Marshall and the DEI Board are not named as Defendants in this Complaint.

'affinity groups to discuss concerns for equity, inclusivity, and diversity . . . ,'" that "attendance at the 'affinity group meetings or activities is voluntary,'" and that "'participation in or non-participation in any affinity group' would not be used to determine job promotions, job opportunities[,] or job performance." (*Id.* ¶ 66.) Lee and Weinstein did not report Eisenberg's complaint to NDI's Executive Director, but Lee directed Eisenberg to the NDI Employee Handbook (the "Handbook").[3] (*Id.* ¶¶ 68–69.)

### 2. Maternity Leave and Medical Exemption

Eisenberg went on maternity leave in August 2021 and received her salary until the end of September 2021. (*Id.* ¶ 72.) Effective October 1, 2021, NDI instituted a "back[-]to[-]work policy" that provided a hybrid in-office and remote model with a staggered work schedule, and also required all employees to be vaccinated against COVID-19, with limited health and religious exemptions. (*Id.* ¶¶ 73–74.) On September 30, 2021, Eisenberg's doctor wrote a note in which he recommended that Eisenberg "delay receiving the COVID vaccine until she finished breastfeeding. (*Id.* ¶ 75.) Eisenberg provided the note to Lee on October 1, 2021, and later had a telephone conversation with the Artistic Director[4] in which Eisenberg discussed ending her maternity leave on January 1, 2022. (*Id.*) During Eisenberg's leave, NDI reassigned one of the schools at which Eisenberg had taught to another teacher. (*Id.* ¶ 76.) NDI then approved Eisenberg's medical exemption. (*Id.* ¶ 77.)

---

[3] The Handbook describes NDI's policies, which include prohibiting harassment; promoting equal employment opportunities; prohibiting discrimination; urging employees to report incidents of discrimination, harassment, or retaliation; and requiring managers and supervisors to report complaints of harassment, discrimination, retaliation, or other policy violations to the Executive Director. (*Id.* ¶¶ 28–41.)

[4] The Complaint does not specify with which Artistic Director Eisenberg spoke.

On November 23, 2021, Eisenberg sent Lee, Weinstein, and Gayner an email in which she noted her medical exemption and asked about accommodation for remote employment upon her return from maternity leave.  (*Id.* ¶ 78.)  In December 2021, New York City Mayor DeBlasio issued an Emergency Executive Order ("EEO") requiring that all teachers working directly with students in New York City must be vaccinated against COVID-19.  (*Id.* ¶¶ 79–80.)  At some point thereafter, Lee called Eisenberg and denied her request for "accommodation beyond unpaid leave . . . ."  (*Id.* ¶¶ 81–82.)  During the conversation, Braun, who has "experience and training in workplace rights and responsibilities," interjected in a "contentious" manner and "advised Lee . . . that what she was doing was illegal, among other things."  (*Id.* ¶¶ 87–88, 93.)  Eisenberg apologized to Lee for Braun's tone.  (*Id.* ¶ 94.)

On December 10, 2021, Solomon, Weinstein, and Kay sent Eisenberg an email in which they offered an accommodation, permitting her to take three months unpaid leave without benefits until she was to become fully vaccinated, and also informed her that Braun's communication with Lee during the phone call was "unprofessional and completely unacceptable and [was] against NDI's anti-harassment policy."[5]  (*Id.* ¶¶ 89, 96 (alteration in original).)  Eisenberg responded on December 10, 2021 via email and "not[ed] that her medical exemption was being ignored," asserted "that she could contribute in many ways other than just in the classroom," noted that she "believe[d] that she had constitutional rights that were being violated by NDI's refusal to recognize her medical exemption," argued "that her decision related to such concerns should not cause her to lose her job," and put forth that none of her concerns constituted "a personal attack

---

[5] Plaintiffs assert, without any basis of fact, that "[u]pon information and belief, all defendants, including, but not limited to, John Does 1-25 agreed with such decision with respect to [Eisenberg]."  (*Id.* ¶ 90.)

on Lee." (*Id.* ¶ 97.)  Eisenberg did not receive an immediate response and followed up with another email on December 15, 2021.  (*Id.* ¶ 98.)

On December 17, 2021, Eisenberg received an email from Solomon, Gayner, and Weinstein in which they expressed concern that Eisenberg's "conduct toward [Lee] during the prior telephone discussion, and the conduct of [Braun] during the call, ha[d] not yet been addressed or acknowledged.  (*Id.* ¶ 99.)  The email asserted that NDI's attorneys advised compliance with New York law although Eisenberg's "employment in New Jersey may be subject to different requirements than [they] have in New York"; confirmed that they were "not dictating [Eisenberg's] personal health care decisions or how [she] cho[se] to care for [her] child"; and noted that Eisenberg's employment was not terminated.  (*Id.*)  Eisenberg responded on December 22, 2021 and requested a conversation with Gayner and Weinstein to "explore artistic possibilities," and noted that she removed Solomon from the communications.  (*Id.* ¶ 100.)  The parties then communicated on December 29, 2021 and December 30, 2021 and NDI confirmed that it would accommodate an unpaid leave of absence.  (*Id.* ¶ 101.)

On January 2, 2022, Eisenberg informed Gayner and Weinstein via email "that the New York Department of Education was accepting medical and religious exemptions [that] provided for unpaid leave with benefits through September 2022," and asked if it would "truly cause financial strain or duress to keep [her] employed and on salary" during her leave.  (*Id.* ¶ 102.)  In response to Eisenberg's email, on January 7, 2022, Keil, NDI's attorney, sent Eisenberg a letter in which Keil conveyed that NDI would accommodate Eisenberg with a three-month leave without pay, noted that further accommodation would not be made if Eisenberg remained unvaccinated, and requested a response by January 12, 2022.  (*Id.* ¶ 108.)  Eisenberg responded the same day via email and asked if NDI accepted her medical exemption, and asserted that "employers and board

7

members do not typically have the right or need to their employees' comprehensive medical history, beyond what is necessary as it related [sic] to ability to work and work performance." (*Id.* ¶ 109.)   The Keil Defendants responded on January 8, 2022 and confirmed that "the only 'reasonable accommodation' was leave without pay," and reminded Eisenberg that she still needed to address her "prior mistreatment of [Lee]" and acknowledge and apologize for it before returning to work, but that her conduct would "not prevent a response to [her] medical request." (*Id.* ¶ 110.)

On February 3, 2022, Eisenberg responded to the Keil Defendants and asked whether she could work in a residency in the Catskills, which was not subject to the mandatory vaccination policy enacted in New York City. (*Id.* ¶ 111.)  Eisenberg also requested an opportunity to explain the phone call with Lee, if it had resulted in a claim of harassment. (*Id.*)  On February 5, 2022, Keil responded and confirmed that "corrective action [was] warranted because the way [Lee] was treated during the call was unacceptable," and noted that a memo was not yet in her personnel file because NDI was waiting for Eisenberg to "acknowledge what happened and provide some meaningful assurance, to [Lee] and to NDI, that no one in the NDI community would be treated in such a manner going forward." (*Id.* ¶ 112.)  Keil informed Eisenberg that the "level of corrective action NDI thinks is appropriate will depend, to a very large extent, on what [she] choose[s] to say about the matter," and invited her to send a written statement that NDI could then consider. (*Id.*)

Eisenberg messaged Keil again and asked if she should prepare for Catskills summer work. (*Id.* ¶ 113.)  On February 14, 2022, Keil responded that Eisenberg should not do any work on unpaid leave, and that she should take her response to the incident with Lee seriously and submit a statement about the matter that day, and if she was not able to do so that day, explain the reason for delay and provide an estimate on when it could be expected. (*Id.* ¶ 113.)  Keil confirmed that if she did not provide a statement, "NDI [would] proceed to a decision." (*Id.*)  Eisenberg responded

the same day and asserted that she "felt harassed by Keil"; she thought he was trying to get her to resign, which she did not plan to do; she refused to admit harassment of Lee; and she gave her response in December and was willing to meet with supervisors then, but they chose not to do so. (*Id.* ¶ 114.) Eisenberg accused Keil of "reinforcing the lie that there was harassment," and asserted that she had been raising concerns about NDI violating the law during the call with Lee. (*Id.*)

        3.  <u>Termination</u>

On February 22, 2022, Escalante contacted Eisenberg and terminated her employment "based on the abusive treatment that [she] and [her husband] subjected [Lee] to during a telephone conference on December 22, 2021." (*Id.* ¶ 115.) The same day, Escalante sent an email to the NDI staff informing them that "effective immediately, [Eisenberg was] no longer associated with NDI," and sent a subsequent email on February 25, 2022 reiterating the same. (*Id.* ¶ 116.) On February 25, 2022 and February 26, 2022, Escalante and Gayner sent emails to an employee of NDI, and another employee of NDI and BOLD Arts, confirming that NDI "parted ways" with Eisenberg because of her unacceptable and "very unprofessional" interaction with a staff member, for which she was given multiple opportunities to rectify but declined to do so. (*Id.* ¶¶ 117, 119.) In the February 26, 2022 email, Escalante and Gayner assured the employee to whom the email was sent that NDI employees "will be treated with respect and fairness," and that the NDI staff "deserve to be protected from unprofessional interactions." (*Id.* ¶ 118.)

**B.  Procedural History**

On July 12, 2022, Eisenberg and Braun filed a Complaint asserting the following claims against all Defendants:   Title VI Intentional Racial Discrimination in a Federally Funded Educational Program (Count I); violations of the New Jersey Law Against Discrimination – Race, Hostile Work Environment, Color, Disability, Predisposing Genetic Characteristics, Marital

Status, (Counts II, III, IV, V, VI, VII); violation of the New York City Human Rights Law (Count VIII); violation of the New Jersey Whistleblower's Act, N.J. Stat. § 34:19-1, *et seq.* (Count IX); Intentional Infliction of Emotional Distress (as to Eisenberg) (Count X); Tortious Interference with Economic Relations (Count XI); violation of the New Jersey Civil Rights Act (Count XII); Civil Conspiracy (Count XIII); Breach of the Covenant of Good Faith and Fair Dealing (Count XIV); Defamation (Count XV); and Intentional Infliction of Emotional Distress (as to Braun) (Count XVI). (*See* D.E. 1 ¶¶ 124–202.)

On September 22, 2022, the NDI Defendants filed the instant Motion to Dismiss, (*see* D.E. 6), and on October 10, 2022, the Keil Defendants filed the instant Motion to Dismiss, (*see* D.E. 19.) On November 16, 2022, the parties stipulated to dismissal without prejudice of claims against Individual NDI Defendant Marc Solomon. (See D.E. 28.) Thereafter, the remaining parties completed timely briefing. (*See* D.E. 26; D.E. 27; D.E. 29; D.E. 30.)

## II.     LEGAL STANDARD

### A.      Rule 12(b)(2)

Federal courts in New Jersey exercise personal jurisdiction to the extent permitted by New Jersey law. *See Miller Yacht Sales, Inc. Smith*, 384 F.3d 93, 96 (3d Cir. 2004). New Jersey's long-arm statute provides for the exercise of jurisdiction over non-residents "to the uttermost limits permitted by the United States Constitution." *Charles Gendler & Co., Inc. v. Telecom Equip. Corp.*, 508 A.2d 1127, 1131 (1986) (quoting *Avdel Corp. v. Mecure*, 277 A.2d 207, 209 (N.J. 1971)); N.J. CT. R. 4:4–4. "Personal jurisdiction under the Due Process Clause depends upon 'the relationship among the defendant, the forum, and the litigation.'" *IMO Indus. v. Kiekert AG*, 155 F.3d 254, 259 (3d Cir. 1998) (quoting *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977)). Courts in New Jersey "look to federal law for the interpretation of the limits" on personal jurisdiction, *id.*

(citing *Mesalic v. Fiberfloat Corp.*, 897 F.2d 696, 698 n.5 (3d Cir. 1990)), and "ask whether, under the Due Process Clause, the defendant has certain minimum contacts with [New Jersey] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice," *O'Connor v. Sandy Lane Hotel Co., Ltd.*, 496 F.3d 312, 316 (3d Cir. 2007) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

**B.      Rule 12(b)(6)**

An adequate complaint must be "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2).  This Rule "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.  Factual allegations must be enough to raise a right to relief above the speculative level . . . ." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citing 5 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1216, 235–36 (3d ed. 2004)); *see also Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (stating that Rule 8 "requires a 'showing,' rather than a blanket assertion, of an entitlement to relief" (quoting *Twombly*, 550 U.S. at 555)).

When considering a Motion to Dismiss under Rule 12(b)(6), a court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips*, 515 F.3d at 231 (quoting *Pinker v. Roche Holdings, Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555); *see also Fowler v. UPMC Shadyside*, 578 F.3d 203, 209–11 (3d Cir. 2009) (discussing the *Iqbal* standard).  Determining whether the allegations in a

complaint are "plausible" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679 (citation omitted). If "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint should be dismissed for failing to "show[] . . . that the pleader is entitled to relief" as required by Rule 8(a)(2). *Id.*

## III.   DISCUSSION

### A.   Personal Jurisdiction Over Defendants

A court can assert either general or specific personal jurisdiction over a defendant who has minimum contacts with the forum. *Bristol-Myers Squibb Co. v. Super. Ct. Cal.*, 137 S. Ct. 1773, 1780 (2017) (citing *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). "A court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A.*, 564 U.S. at 919 (quoting *Int'l Shoe Co.*, 326 U.S. at 317). As for individual defendants, however, "[t]he Supreme Court has never found an individual could be subject to general personal jurisdiction based on continuous and systematic contacts with a forum." *M3 USA Corp. v. Hart*, 516 F. Supp. 3d 476, 490 (E.D. Pa. 2021) (quoting *Koch v. Pechota*, No. 16-3637, 2017 WL 43102, at *5 (D.N.J. Sept. 28, 2017)). "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home." *Goodyear Dunlop Tires Operations, S.A.*, 564 U.S. at 924.

Specific jurisdiction is established through a minimum contacts analysis. *See Int'l Shoe Co.*, 326 U.S. at 316; *O'Connor*, 496 F.3d at 316. In the Third Circuit, proving specific jurisdiction

requires establishing the following three requirements: (1) "the defendant must have purposefully directed [its] activities at the forum"; (2) "the litigation must arise out of or relate to at least one of those activities"; and (3) if the first two requirements are met, the exercise of jurisdiction must "otherwise comport[ ] with fair play and substantial justice." *O'Connor*, 496 F.3d at 317 (internal quotation marks and citations omitted). "A single contact that creates a substantial connection with the forum can be sufficient to support the exercise of personal jurisdiction over a defendant." *Miller Yacht Sales*, 384 F.3d at 96 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 n.18 (1985)).

When a defendant challenges a court's exercise of personal jurisdiction, "the plaintiff bears the burden to prove, by a preponderance of the evidence, facts sufficient to establish personal jurisdiction." *Carteret Sav. Bank, FA v. Shushan*, 954 F.2d 141, 146 (3d Cir. 1992) (citing *Time Share Vacation v. Atlantic Resorts, Ltd.*, 735 F.2d 61, 65 (3d Cir.1984)). However, "when the court does not hold an evidentiary hearing on the motion," "the plaintiff need only establish a prima facie case of personal jurisdiction" and "is entitled to have its allegations taken as true and all factual disputes drawn in its favor." *Chernus v. Logitech, Inc.*, Civ. No. 17-673, 2018 WL 1981481, at *3 (D.N.J. Apr. 27, 2018) (quoting *Miller Yacht Sales*, 384 F.3d at 97); *see also Carteret Sav. Bank*, 954 F.2d at 142 n.1.

### 1. Individual NDI Defendants

This Court first addresses the Individual NDI Defendants' challenge to personal jurisdiction. (*See* D.E. 6-1 at 27–30.) [6] Plaintiffs concede that this Court does not have general

---

[6] Citations of page numbers from the parties' briefs refer to the D.E. filing page numbers, not to each document's original page numbers.

jurisdiction over the Individual NDI Plaintiffs, thus the analysis proceeds to specific jurisdiction. (D.E. 27 at 38.)

Plaintiffs assert that "the Individual [NDI] Defendants each 'had the minimum contacts with the forum necessary for them to have reasonably anticipated being haled into court there.'" (*Id.* at 40 (quoting *Pennzoil Prods. Co. v. Colelli & Assocs.*, 149 F.3d 197, 201 (3d Cir. 1998) (internal quotation and citation omitted)).)   Plaintiffs then describe complaints Eisenberg lodged with the various NDI Defendants, and their subsequent action or inaction concerning the complaints, but fail to draw a connection as to how those complaints relate to specific jurisdiction. (*Id.* at 40–41.)  Plaintiffs' primary arguments in support of the Individual NDI Defendants being subject to personal jurisdiction center on Plaintiffs living in and filing their claim in New Jersey, and also reference an email sent by Solomon, Gayner, and Weinstein, in which they "advised that NDI is required to comply with New York law" and mentioned that Eisenberg's "employment in New Jersey may be subject to different requirements than [they] have in New York," (D.E. 1 ¶ 99). (*See* D.E. 27 at 41.)  Plaintiffs' residency, however, is insufficient to demonstrate that any of the Individual NDI Defendants "purposefully directed [their] activities at the forum" and there is no evidence that the claim "arise[s] out of or relate[s] to at least one of the activities," since there are no activities purposefully directed at the forum.  *O'Connor*, 496 F.3d at 317.

Moreover, the email Plaintiffs cite in support of specific jurisdiction, which was sent by Solomon, Gayner, and Weinstein, does not demonstrate an action showing that the Individual NDI Defendants "purposefully avail[ed themselves] of the privilege of conducting activities within the forum State." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U. S. ___, ___, 141 S. Ct. 1017, 1024–25 (2021) (slip op., at 8) (quoting *Hanson v. Denckla*, 357 U. S. 235, 253 (1958)). Furthermore, contrary to Plaintiffs' argument that the email "acknowledg[es] that they were

dealing with a New Jersey employee," (D.E. 27 at 41), the email explicitly demonstrates that the Individual NDI employees considered Eisenberg a New York-based employee and specifically reminded her of such.  (D.E. 27 at 41.)  Representatives of an employer emailing a non-resident employee and acknowledging that the person lives in another state but that the employee is a New York-based employee, or representatives of an employer sending multiple emails and accepting phone calls from a non-resident employee to discuss employment matters does not constitute purposefully directed activity that supports an exercise of specific jurisdiction.  There simply was no deliberate targeting of the forum by the Individual NDI Defendants.  Because this Court cannot exercise specific jurisdiction over the remaining Individual NDI Defendants, the claims against Gayner, Weinstein, Lee, and Escalante are dismissed.[7]

### 2.  NDI

Defendants do not contest this Court's general jurisdiction over NDI.  (*See* D.E. 6-1; D.E. 29 at 7–8.)  Accordingly, this Court exercises personal jurisdiction over Plaintiff's claims against NDI.

### 3.  Keil Defendants

The Keil Defendants assert that this Court lacks personal jurisdiction.  (D.E. 19-1 at 21.) Plaintiffs concede that the Keil Defendants are not subject to general jurisdiction but argue that the Keil Defendants are subject to specific jurisdiction because the Keil Defendants purportedly wrote NDI's employee handbook and communicated with Eisenberg via email concerning employment matters pertaining to her complaints, thereby "engag[ing] in the unauthorized practice of law in New Jersey," and because Plaintiffs live in New Jersey.  (D.E. 26 at 31, 33–35.) Plaintiffs' arguments are unavailing as they have not, "by a preponderance of the evidence,"

---

[7] Claims against Solomon were previously dismissed by stipulation.  (*See* D.E. 28.)

presented "facts sufficient to establish personal jurisdiction." *Carteret Sav. Bank, FA*, 954 F.2d at 146 (citing *Time Share Vacation*, 735 F.2d at 65).

First, the authorship of the employee handbook is irrelevant to whether personal jurisdiction exists and was not raised in the Complaint.  Second, Plaintiffs' assertion that the action the Keil Defendants took in this matter—emailing an employee who lives in New Jersey to discuss employment disputes the employee has with their client, a New York-based employer—somehow constitutes the Keil Defendants practicing law in New Jersey, which in turn confers specific jurisdiction over these Defendants, is baseless and would likely lead to farcical results if this Court were to adopt such a premise.[8]  Such contact does not demonstrate that the Keil Defendants purposefully conducted activities in New Jersey, *see Ford Motor Co.*, 592 U. S. ___ (slip op., at 8), and, importantly, does not demonstrate that they engaged in the unauthorized practice of law in New Jersey.  Third, Plaintiffs' residency does not impact the analysis as it pertains to this Court's exercise of jurisdiction over these Defendants.  The Keil Defendants are based in and practice law in New York.

In sum, even as this Court takes Plaintiffs' "allegations . . . as true and [draws] all factual disputes . . . in [their] favor," Plaintiffs have failed to establish a *prima facie* showing of personal jurisdiction."  *Chernus*, 2018 WL 1981481, at *3 (quoting *Miller Yacht Sales*, 384 F.3d at 97).  This Court, therefore, finds that because it cannot exercise personal jurisdiction over the Keil Defendants, the claims against these Defendants are dismissed.

---

[8] For example, if courts were to find that specific jurisdiction exists based on Plaintiffs' premise, attorneys representing companies with employees located in various states would need to have membership in the bars of every state just to communicate with the employees or, alternatively, employers would have to prohibit employees from living—or working while traveling, for that matter—outside of the state in which they are employed.  Such a result would conceivably cause immeasurable upheaval in and innumerable consequences to the legal community.

**B. Plaintiff's Claims Against NDI**

As an initial matter, Plaintiffs concede dismissal of the New Jersey Civil Rights Act Claim. Therefore, Count XII is dismissed.  (D.E. 27 at 43, n.4.)

The next matter to discuss is whether Plaintiffs have sufficiently pleaded facts supporting the Title VI claim against NDI.  NDI asserts that Plaintiffs have not adequately pleaded a Title VI claim because the Complaint, while mentioning that NDI receives federal funding, "fails to allege what type of federal funding was provided . . . , and fails to allege the primary purpose of that federal funding."  (D.E. 6-1 at 39.)  Plaintiffs argue that discovery is needed to adequately plead the claim, or, alternatively, they seek leave to amend the Complaint and add "magic words" that will correct the pleading.  (D.E. 27 at 50–51.)  After reviewing the Complaint and viewing the facts in a light most favorable to Plaintiff, *see Phillips*, 515 F.3d at 231, this Court finds that this Count is insufficiently pleaded.[9]

Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d.  Title VI is limited to prohibiting intentional discrimination in a federally funded program, which, importantly, applies only to programs "where a primary objective of the Federal financial assistance is to provide employment."  42 U.S.C. § 2000d-3; *see Sabol v. Bd. of Educ.*, 510 F. Supp. 892, 896 (D.N.J. 1981) (noting that Title VI "specifically limits the action of federal departments or agencies to employment practices in programs receiving federal financial

---

[9] NDI also argues that the Title VI claim was not filed within the requisite statute of limitations.  (*See* D.E. 6-1 at 42–44.)  Although NDI raises a cogent point about whether the claim was filed within the statute of limitations, given the insufficient pleading, this Court declines to reach that argument.

assistance that has a primary objective of providing employment"); *see also White v. Williams*, 179 F. Supp. 2d 405, (D.N.J. 2002) (citing *Alexander v. Sandoval*, 531 U.S. 1049 (2001)).

Here, Plaintiffs pepper references to NDI receiving federal funding throughout the Complaint, (*see* D.E. 1 *passim*), but do not once allege and specify facts that demonstrate that the "primary objective of the Federal financial assistance is to provide employment."  42 U.S.C. § 2000d-3.  There is neither an explicit statement about nor even a hinted reference in the Complaint to suggest that the funding provided to NDI has a primary objective of providing employment.  The factual details provided in the Complaint demonstrate that NDI is an organization that provides dance instruction and, consequently, hires persons to instruct dance students, which does not remotely translate to employment being a primary objective, but rather an incidental one at best.  (*See generally* D.E. 1.)  Plaintiffs indicate that discovery would be necessary to prove that the purpose of the funds is to provide employment as an objective, but that request misses the mark; Plaintiffs must assert the purpose in the Complaint—provided there is a good-faith basis for doing so—to establish that Plaintiffs have a factual basis for a legally cognizable claim.  At present, the Complaint falls short of establishing facts sufficient to support a Title VI claim.

Plaintiffs appear to recognize the insufficiency of the pleading as they alternatively request leave to amend the complaint "to include the 'magic words' that 'upon information and belief, the primary purpose of funding was to provide employment.'"  (D.E. 27 at 51.)  While those words may begin to remedy the insufficiency of the Complaint, as Defendants correctly point out, inserting that language on its own cannot "cure[] the lack of any good[-]faith basis for the factual allegation."  (D.E. 29 at 12.)  If amending, Plaintiffs must provide good-faith factual support for any such assertion and should not endeavor to simply try to insert "magic words" to breathe life

into a defunct claim.  Should Plaintiffs decide to amend, they are cautioned to keep in mind that a complaint "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.  Factual allegations must be enough to raise a right to relief above the speculative level . . . ."  *Twombly*, 550 U.S. at 555 (citing 5 C. WRIGHT & A. MILLER § 1216 at 235–36); *see also Phillips*, 515 F.3d at 231.  Accordingly, this Court finds that Count I is insufficiently pleaded and is therefore dismissed.

Consequently, without the Title VI claim—Plaintiffs' sole federal claim, pursuant to 28 U.S.C. § 1367(c), this Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining claims and, therefore, will not analyze the merits of those claims.[10]

## IV.    CONCLUSION

For the reasons set forth above, the NDI Defendants' Motion to Dismiss, (D.E. 6), is **GRANTED**; and the Keil Defendants' Motion to Dismiss, (D.E. 19), is **GRANTED**.  Plaintiffs shall have an opportunity to amend the Complaint, assuming they can cure the defects identified herein.  Any amended pleading must be filed within thirty (30) days.  An appropriate order follows.

      /s/ Susan D. Wigenton
**SUSAN D. WIGENTON, U.S.D.J.**

Orig:        Clerk
cc:          Cathy L. Waldor, U.S.M.J.
             Parties

---

[10] It is noted that the viability of Plaintiffs' State claims rest on whether Eisenberg is legally considered a New York or New Jersey employee—a distinction Plaintiffs appear to draw both ways in the Complaint.  (*See generally* D.E. 1.)  Plaintiffs are urged to carefully consider and research this critical issue further, should they decide to amend the Complaint.